**In re DUNES HOTEL ASSOCIATES, a South Carolina general partnership, Debtor.**

**Civ. A. No. 94–75715.**

United States Bankruptcy Court, D. South Carolina.

May 31, 1995.

164

Julio E. Mendoza, Jr., Columbia, SC, John J. Dawson, Phoenix, AZ, for Debtor.

Sherwood M. Cleveland, Columbia, SC, Richard F. Casher, Hartford, CT, for Aetna Life Ins. Co.

### ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER came before the Court pursuant to: (i) the *"Motion Of Aetna Life Insurance Company For Dismissal Of The Case, Or, In The Alternative, For Relief From The Automatic Stay"* (the "Aetna Motion"), filed by Aetna Life Insurance Company ("Aetna"); and (ii) *"S.C. Hyatt Corporation's Motion To Dismiss Case Or In The Alternative Terminate Exclusivity"* (the "SC Hyatt Motion"), filed by S.C. Hyatt Corporation ("SC Hyatt"). Dunes Hotel Associates, which is the Debtor and the Debtor–In–Possession in the above-captioned Chapter 11 case ("Dunes" or "Debtor"), filed timely objections to both of the Dismissal Motions.[1]

The Court set a consolidated hearing to consider the Dismissal Motions. The Court held three (3) days of evidentiary hearings on the Dismissal Motions on April 11–12, 1995 and May 8, 1995 (the "Evidentiary Hearing"). As a result of the pleadings filed with the Court, the arguments presented by counsel for the respective parties, the evidence presented at the Evidentiary Hearing, and

1. The Aetna Motion and the SC Hyatt Motion are collectively referred to herein as the "Dismissal Motions."

the entire record before the Court, the Court makes the following Findings of Fact and Conclusions of Law:[2]

## FINDINGS OF FACT

1. Dunes is a South Carolina general partnership which was formed in 1972.

2. The general partners of Dunes are Andrick Hotel Corporation ("Andrick") and Meyers Enterprises, Inc. ("Meyers").

3. The stock of Andrick and Meyers is owned by a wholly owned affiliate of the General Electric Pension Trust ("GEPT") which is one of the largest pension trusts in the United States.

4. Dunes' primary asset is the real property, improvements, and personal property which comprise the 505–room resort/convention hotel commonly known as the Hyatt Regency Hilton Head or the Hyatt on Hilton Head Island, located on Hilton Head Island, Beaufort County, South Carolina (the "Hotel Property").

5. Dunes has owned the Hotel Property since the early 1970s. Dunes oversaw the original construction of the hotel (completed in 1975), as well as later substantial expansions and renovations of the hotel (in 1986 and 1992). Dunes also provided or obtained the financing for those construction, expansion, and renovation projects.

6. The Hotel Property which is the primary asset of Dunes is a substantial operating business. It is the largest resort hotel property located on Hilton Head Island, South Carolina, one of the nation's premier resort destinations.

7. More than 300 people are directly employed in operating the Hotel Property.[3]

8. According to SC Hyatt as the Hotel Property's operator, the Hotel Property currently generates more than $26,000,000 of annual cash flow. The income generated by the operation of the Hotel Property will be referred to herein as the "Hotel Income".[4]

9. The Hotel Property is currently operated by SC Hyatt, which is a wholly owned subsidiary of Hyatt Corporation, a Delaware corporation ("Hyatt"), pursuant to an agreement with Dunes (the "SC Hyatt Agreement"). Hyatt was the original contracting party with Dunes. Hyatt's rights under the SC Hyatt Agreement have been assigned to SC Hyatt.

10. Under the SC Hyatt Agreement, SC Hyatt initially collects the Hotel Income and charges all expenses of the Hotel Property against the Hotel Income, including all of the following expenses:

(1) Wages, salaries, and benefits of employees at the Hotel Property;

(2) Taxes relating to the Hotel Property;

(3) Insurance for the Hotel Property; and

(4) The charges of vendors and suppliers which provide goods and services to the Hotel Property.[5]

11. After the deductions of all charges against the Hotel Income for the expenses of

**2.** All Findings of Fact which are more appropriately characterized as Conclusions of Law (wholly or in part) will be deemed to be such, and *vice versa.*

**3.** In citing the approximate number of employees as an indication of the size of the operating business, it is not necessary for the Court to consider whether the employer is Dunes (as the owner of the Hotel Property) or SC Hyatt (as the operator of the Hotel Property). Even though SC Hyatt is the employer of record, there is no dispute that the wages, salaries, and benefits payable to the employees are charged against the Hotel Income (defined herein) before Dunes receives any distribution of or on account of the Hotel Income.

**4.** In ruling on the Dismissal Motions, the Court is not making any decisions regarding the subject matter of Dunes' adversary litigation against

Hyatt and SC Hyatt. Therefore, terms such as "Hotel Income," "operator," and similar language are intended to be neutral and are used by the Court only for convenience. The parties proceeded in this manner during the Evidentiary Hearing and previously when the Agreed Adequate Protection Order (defined herein) was entered by the Court on January 23, 1995.

**5.** Some of these expenses are or may be paid from SC Hyatt or Hyatt concentration accounts after the Hotel Income is swept to fund those accounts directly or indirectly. Ultimately, however, the expenses are charged against the Hotel Income whenever there is a calculation of how much money Dunes will receive from the operations of its Hotel Property.

the Hotel Property, remaining Hotel Income is paid to SC Hyatt and to Dunes according to the formula stated in the SC Hyatt Agreement.

12. In 1986, Dunes executed a promissory note (the "Promissory Note") and other loan documents with Aetna in order to evidence and secure a loan. The original principal amount of the Promissory Note was $50,000,-000.

13. For purposes of the Evidentiary Hearing only, the parties have stipulated that Aetna holds a lien on the Hotel Property, the Hotel Income, an FF & E Account, and a Sequestered Account (as defined herein) as security for repayment of the amounts due under the Promissory Note.

14. The Promissory Note is a non-recourse obligation. Aetna's right to repayment is limited to its collateral. Aetna did not require the general partners of Dunes, or their stockholder, or GEPT, or any other individual or entity to undertake recourse liability for repayment of the Promissory Note.

15. The contract rate of interest under the Promissory Note is 9.25%.

16. Dunes made all payments required under the Promissory Note from the 1986 execution of the note until the July 1, 1994 maturity date of the note.

17. The Promissory Note matured on July 1, 1994, at which time Dunes owed a balloon payment of all unpaid principal and accrued unpaid interest under the Promissory Note.

18. For purposes of the Evidentiary Hearing only, the parties have stipulated that the unpaid principal amount due under the Promissory Note on the July 1, 1994 maturity date was $46,589,859.69.

19. Dunes did not pay the balloon payment due under the Promissory Note on July 1, 1994 because Dunes did not have sufficient cash to do so.

20. Dunes paid Aetna a payment of $389,-977.59 after the maturity date of the Promissory Note. Aetna did not apply these funds to the amount owing under the Promissory Note.

21. On August 28, 1994, Aetna started a foreclosure proceeding against the Hotel Property in South Carolina state court (the "Foreclosure Action"). A hearing in the Foreclosure Action was scheduled for December 12, 1994.

22. Aetna asserts that as of the November 18, 1994 petition date in Dunes' Chapter 11 case (the "Petition Date"), Aetna was owed a total of $48,560,917.99 under the Promissory Note (the "Aetna Claim"). Among other objections to the Aetna claim, Dunes asserts that the amount of the Aetna Claim on the Petition Date was $48,229,-888.06, less $398,997.59 in unapplied funds held by Aetna.[6]

23. Both before and after the filing of Chapter 11, there were negotiations between Dunes and Hyatt and Dunes and Aetna regarding restructuring their respective relationships. These negotiations were ultimately unsuccessful.

24. Dunes' initial Chapter 11 Statements and Schedules (the "Initial Statements and Schedules") were filed on or about December 15, 1994 and listed Aetna as Dunes' only secured creditor. The Initial Statements and Schedules listed tax authorities as creditors in unknown amounts. The Initial Statements and Schedules contained footnotes in which Dunes stated that it believed that any tax claims or vendor claims were assertable only against SC Hyatt pursuant to the SC Hyatt Agreement.

25. At the initial Bankruptcy Code § 341 meeting of creditors (the "341 Meeting"), counsel for Dunes stated on the record that the Initial Statements and Schedules might

---

6. The mathematical difference in the Aetna Claim amounts asserted by the parties arises from the fact that Aetna includes default interest and costs in its calculation of the Aetna Claim. Among other objections to the Aetna Claim, Dunes disputes Aetna's entitlement to default interest and costs. The Court is not determining the Aetna Claim at this time. Furthermore, the differences in mathematical computations (aside from other Dunes' objections to the Aetna Claim) are not controlling as to the Court's ruling on the Dismissal Motions, including the stay relief alternative of the Aetna Motion.

have to be amended when more information regarding claims became available to Dunes.

26. On April 5, 1995, Dunes filed its amended Chapter 11 Statements and Schedules. Dunes acknowledged that the Amended Statements and Schedules were filed because the Initial Statements and Schedules were wrong; and Dunes further stated that the Amended Statements and Schedules were filed to describe more accurately Dunes' actual creditor structure and related matters.

27. Dunes asserts that its creditors at the time of the filing of its Petition included Beaufort County, South Carolina (on a tax claim), Pitney Bowes, certain vendor claims that were paid after the Petition Date by SC Hyatt and the Wolf Block law firm, prepetition counsel for the Debtor.

28. Aetna and SC Hyatt assert that Dunes had no other creditors than themselves and possibly the Wolf Block law firm.

29. On April 3, 1995, Aetna made a written offer to purchase the Wolf Block claim for 200% of the face amount of the claim. Wolf Block refused the Aetna offer.

30. After the filing of Dunes' Chapter 11 case, Dunes and Aetna negotiated and executed the *"Stipulation And Consent Order Conditioning Dunes Hotel Associates' Use Of Hotel Income And Providing Adequate Protection Of Aetna Life Insurance Company's Interest In Hotel Income"* dated January 23, 1995 (the "Agreed Adequate Protection Order").

31. The Agreed Adequate Protection Order provides that Dunes will maintain all Hotel Income which it receives in a segregated account (the "Sequestered Account"). The Agreed Adequate Protection Order further provides for monthly adequate protection payments to be made to Aetna (the "Adequate Protection Payment(s)"). The Adequate Protection Payments from the Sequestered Account have been paid from and after the Petition Date and are in the amount of the Promissory Note's contract rate of

interest (9.25%) which accrues monthly on the full principal balance of the Aetna Claim.

32. Dunes has made all of the Adequate Protection Payments required under the Agreed Adequate Protection Order for an approximate total to date of $1.6 million.

33. Since the filing of the Dunes case, SC Hyatt has continued to operate the Hotel Property.

34. For purposes of the Evidentiary Hearing only, the parties have stipulated that the market value of the Hotel Property is $53,000,000. The value of the Hotel Property indicates a present equity cushion over the amount of the Aetna Claim.

35. The Hotel Property is expected to generate, on an annualized basis, at least $398,000 per month through 1995 which exceeds the amount of the monthly Adequate Protection Payments.

36. The Hotel Property is currently entering its April through September "peak" season.

37. On February 27, 1995, Dunes filed an Adversary Complaint in the Dunes case against SC Hyatt and Hyatt (the "Hyatt Adversary Proceeding"). In the Hyatt Adversary Proceeding, Dunes has requested: (i) avoidance under Bankruptcy Code 11 U.S.C. § 544(a)[7] of SC Hyatt's claim of a leasehold interest in the Hotel Property under the SC Hyatt Agreement; (ii) in the alternative, a declaratory judgment that the SC Hyatt Agreement is an executory management contract which Dunes may reject under Bankruptcy Code § 365 if and to the extent that the SC Hyatt Agreement is not already terminated or terminable due to material breaches by SC Hyatt and/or Hyatt; and (iii) a turnover order regarding the Hotel Property and an accounting regarding the Hotel Income under Bankruptcy Code § 542.[8]

38. SC Hyatt and Hyatt have filed a motion to dismiss the Hyatt Adversary Proceed-

---

7. Further references to the Bankruptcy Code, 11 U.S.C. 101, *et seq.*, will be by section number only.

8. The Court has taken judicial notice of the Complaint initiating the Hyatt Adversary Proceeding as filed with the Court and listed as Exhibit JT6.

ing to which Dunes has filed a response.[9] Dunes also has filed a motion for partial summary judgment on the Bankruptcy Code § 544(a) avoidance claim for relief in the Complaint. These motions are set for hearing before the Court on June 1, 1995.

39. On March 20, 1995, Dunes filed its initial plan of reorganization (the "Plan") and its accompanying disclosure statement (the "Disclosure Statement"). The Plan and Disclosure Statement were filed within the initial 120–day exclusive period provided under Bankruptcy Code § 1121.[10]

40. Dunes also has filed a Conditional Modification of the Plan. The Conditional Modification provides that, if the Court determines that Dunes cannot confirm a plan of reorganization which Aetna and Hyatt/SC Hyatt do not accept, then Dunes will present the Conditional Modification as a non-impairment plan which will pay the Aetna Claim and the Hyatt Claim fully and in cash if, when, and to the extent that each of those claims becomes an allowed claim.[11]

41. Funding of the Plan and the Conditional Modification is expected to be provided by a cash contribution made by Dunes' general partners from funds obtained from GEPT.

42. GEPT has approximately $27–30 billion in assets.

43. All parties acknowledge that GEPT has the financial ability to perform whatever funding commitments it makes in support of Dunes.

44. Dunes objects to allowance of the Aetna Claim.

45. Dunes objects to allowance of any claim asserted by SC Hyatt or Hyatt, including the approximately $30,000 unsecured claim currently asserted by SC Hyatt and any rejection damage claim asserted by SC Hyatt or Hyatt.

46. SC Hyatt objects to the Wolf Block claim.

### CONCLUSIONS OF LAW

A. **The Dunes Case Is A Legitimate Chapter 11 Case And Should Not Be Dismissed As A Case Filed In Bad Faith.**

1. **The Standard for bad faith dismissal in the Fourth Circuit.**

The Fourth Circuit standard for dismissal of a Chapter 11 case as a bad faith filing is one of the most stringent articulated by the federal courts. In *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir.1989), the Fourth Circuit held that to justify dismissing a case on the basis of bad faith, the moving party must prove: (i) that the Chapter 11 case is objectively futile, *and* (ii) that the debtor filed the Chapter 11 case in subjective bad faith. *Accord Superior Siding & Window, Inc. v. Associated Materials, Inc.*, 14 F.3d 240, 242 (4th Cir.1994); *In re Belair 301–50 S.W. Quadrant Commercial Properties, Inc.*, 1992 WL 200849, at p. 3 (4th Cir.1992). The *Carolin* court made clear that the burden of establishing this two-prong requirement is very high:

This [two prong test], we think, is the only sufficiently stringent test of justification for threshold denials of Chapter 11 relief. Such a test obviously contemplates that it is better to risk proceeding with a wrongly motivated invocation of Chapter 11 protections whose futility is not immediately manifest than to risk cutting off even a remote chance that a reorganization effort so motivated might nevertheless yield a successful rehabilitation. Just as obviously, it contemplates that it is better to risk wastefulness of a probably futile but good faith effort to reorganize than it is to risk error in prejudging futility at the threshold.

*Carolin*, 886 F.2d at 701; *accord Belair*, 1992

---

9. Dunes also is opposing the arbitration demand alternatively asserted by Hyatt and SC Hyatt.

10. The Plan, the Disclosure Statement, and all exhibits to the Disclosure Statement were re-

ceived in evidence as Exhibits JT11 and JT11(1) through (8).

11. Dunes' Conditional Modification and its Supplement to the Disclosure Statement were filed

WL 200849, at p. 3.[12]

■ In making a determination regarding allegations of bad faith, the Court must examine the totality of the facts of the case. *Carolin,* 886 F.2d at 701; *accord, In re Surfside Beach Realty Company, Ltd.,* No. 89–03787 (Bankr.D.S.C. 12/28/89) (Bishop, J.); *In re Sweetbrier I Ltd. Partnership,* No. 89–01197 (Bankr.D.S.C. 10/6/89) (Davis, J.). The facts presented at the Evidentiary Hearing do not establish that the Dunes case is objectively futile and they do not establish that the Dunes case was filed in subjective bad faith.

[4, 5] In this case, both Aetna and SC Hyatt not only suffer frustration at the prospect of the Debtor using bankruptcy to restructure their contracts, but they are especially disturbed because this Debtor is ultimately parented by a rich trust and further that this Debtor's actions are primarily focused at them, in light of the limited existence, if any, of other creditors. However, "neither insolvency nor the inability of the Debtor to satisfy its debts is an absolute requirement before (bankruptcy) relief can be sought." *Host Management, Inc. v. Palace Homeowner's Assoc., Inc.,* No. 4:91–3132–21 at p. 8 (D.S.C. 7/15/92) (Traxler, J.). Furthermore, "a bankruptcy revolving around the disputes of a [few] parties is not conclusive of bad faith" Id., p. 8.

These creditors equate bad faith with GEPT's failure to fully fund the Debtor. However, it should be noted that these are sophisticated creditors which did not obtain a recourse loan or guaranty by GEPT and thereby create a legal right to compel contribution or payment. While GEPT's role may be significant in determining the confirmability of a plan or even the appropriateness of the rejection or avoidance of the SC Hyatt Agreement, this Court is not inclined to close the door to bankruptcy by the Debtor at this early stage based on what the creditors are

characterizing as the "shameful" actions of GEPT.

**2.** ***The Dunes case is not objectively futile.***

■ As set forth by the Fourth Circuit Court of Appeals in *Carolin:*

[T]he objective futility inquiry is designed to insure that there is embodied in the [bankruptcy] petition some relation to the statutory objective of resuscitating a financially troubled [debtor]. *In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 765 (1st Cir. 1983). It should concentrate on assessing whether there is an on going concern to preserve and no hope of rehabilitation except according to a debtor's "terminal euphoria". *In re Little Creek Development Co.,* 779 F.2d 1068, 1073 (5th Cir.1986).

*Carolin,* at p. 701, 702.

■ In the instant case, the presence of a significant equity cushion is perhaps the most important factor which distinguishes this case from the majority of the reported cases which have been dismissed for lack of a good faith filing. The debtor's equity in a primary asset is a factor recognized by the *Carolin* court:

Obviously, whether there is net equity in a principal or single asset could be of importance in assessing the possibility of successful reorganization in a particular case.

*Carolin,* at p. 705.

While the equity cushion in this case may be eroded over time, its presence now weighs in favor of the Debtor when this Court examines both the prospects of reorganization and the intentions of the Debtor upon filing.

Secondly, there is no dispute that the Hotel Property generates a significant cash flow from its operations. This cash flow appears sufficient to pay regular debt service, all operational expenses and still generate profit/income to the Debtor. There can be no

with the Court and were received in evidence as Exhibit D38.

**12.** This same stringent two-prong test applies to Aetna's alternative request for stay relief on the basis of bad faith. "[T]he [bad faith] cause requirement for dismissal under [Section 1112] is

not substantively different from the cause requirement for relief from the automatic stay under [Section] 362(d)(1)." *Belair,* 1992 WL 200849, at p. 6 n. 2 (citing *In re Little Creek Development Co.,* 779 F.2d 1068, 1072 (5th Cir. 1986)).

doubt that the Debtor has a valuable going concern in existence to preserve.

■ Finally, while the Plan presently filed by the Debtor calls for certain treatment of its creditors, that Plan may be modified before confirmation. The test of objective futility must not be restricted to only a consideration of a single method of reorganization but any or all viable and effective methods, especially if an ability to perform or consummate is indicated. Due to the value of the Hotel Property and its operations, it appears that a reorganization may effectively be achieved through a refinancing or sale of the Hotel Property, even without considering the prospect of a voluntary infusion of funds by GEPT. In these hearings, Aetna and SC Hyatt did not meet their burden of convincing this Court that a reorganization by Dunes is objectively futile.

■ Instead, Aetna and SC Hyatt rely on technical issues regarding the confirmability of Dunes' present Plan (and any other plan which would impair their claims) by criticizing the Plan's structure and treatment of unsecured claim(s). Much of the focus of the Evidentiary Hearing was these creditors' efforts to show that Dunes had only a lone unsecured creditor (other than Aetna and SC Hyatt) and that was of its counsel, Wolf Block, in the approximate sum of $2,000. Aetna and SC Hyatt rely upon this Court's decision in *In re W.C. Peeler Co., Inc.*, 182 B.R. 435 (Bankr.D.S.C.1995) (Bishop, J.) as authority that a debtor should not be allowed to artificially impair a class of creditors merely to achieve confirmation, particularly when that class is composed of its own prepetition counsel with such a small amount claim. This Court continues to recognize and wholeheartedly agrees with this analysis of the *Peeler* case, but notes that its ruling was made at a hearing on confirmation of a plan and not at an earlier case hearing on dismissal for lack of a good faith filing.

In response to Aetna's and SC Hyatt's arguments, Dunes asserts that it had other unsecured creditors at the time of its filing, which were voluntarily and expeditiously paid by SC Hyatt in order to eliminate other creditors who may vote on the Plan. Dunes also cites Aetna's attempt to purchase Wolf Block's claim as evidence of these creditors' efforts to eliminate the Debtor's ability to meet Bankruptcy Code confirmation requirements.

■ However, based upon the evidence presented to date, this Court does not believe that it is necessary for purposes of the Dismissal Motions to conclusively determine the number and amounts of Dunes' creditors at the time of filing of the case. Dunes' Conditional Modification of its Plan provides a means by which the Debtor's ultimate parent would fund a non-impairment plan and thereby achieve confirmation. This prospect is sufficient to defeat these creditors' arguments under *Carolin* that the Debtor's efforts to reorganize are objectively futile. For purposes of the Dismissal Motions, the burden of demonstrating objective futility is on the Movants and has not been sufficiently sustained to shift the burden to the Debtor as would require the Debtor to conclusively prove that it can confirm the present Plan. (The burden of proof under Bankruptcy Code § 1129 at confirmation is upon the Debtor and it was in that context that this Court made its ruling in *Peeler*. A confirmation hearing on the Debtor's Plan in this case is likely to be held within approximately 60 days of the entry of this Order.)

[11, 12] The failure of the Movants to establish objective futility alone requires denial of the Movants' request to dismiss the Dunes case for bad faith. *See Carolin*, 886 F.2d at 700, 701 ("*both* objective futility and subjective bad faith [must] be shown in order to warrant dismissals for want of good faith") (emphasis in original).[13]

### 3. The totality of the facts does not demonstrate bad faith.

■ The subjective bad faith requirement of *Carolin* is:

designed to insure that the petitioner actually intends to use the provisions of Chapter 11 to reorganize and rehabilitate an

---

13. The Movants' failure to establish that the Dunes case is objectively futile also requires the denial of their request that the Dunes case be dismissed under Bankruptcy Code § 1112(b)(2).

existing enterprise or to preserve going concern values of a viable or existing business. Citing *In re Victory Constr. Co.,* 9 B.R. 549, 564 (Bankr.C.D.Cal.1981). Put obversely, its aim is to determine whether the petitioner's real motivation is "to abuse the reorganization process" and "to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities." *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. BAP 1983).

*Carolin* at p. 702.

As stated above, this Court has concluded that Dunes' filing constitutes a means to protect and rehabilitate a valuable existing business. The evidence indicates that there were prepetition negotiations between the Debtor and Movants respectively with the aim of all being to avoid the bankruptcy filing. When negotiations did not succeed, the Debtor filed this case to avoid the loss of the Hotel Property by foreclosure. In this case, Dunes has moved timely to file a Plan and Disclosure Statement, file a Conditional Modification, and instigate litigation with Hyatt/SC Hyatt regarding the SC Hyatt Agreement.

The Movants cite two major indicators of subjective bad faith; 1) GEPT's ability to fully and presently pay the indebtedness to Aetna, and 2) Dunes attempt to use bankruptcy laws to reject or void the SC Hyatt Agreement when it otherwise could not outside of bankruptcy.

As to the first factor, this Court has earlier stated that it is not swayed by the failure of GEPT to pay off the debt. It is not legally required to do so. Aetna did not secure such a legal obligation from GEPT when it made the loan.

As to the second indicator, this Court believes that a determination of bad faith, if any, in the Debtor's attempts to reject the SC Hyatt Agreement is a different issue to be interpreted in a different context than subjective bad faith standard set forth in the *Carolin* case. While some courts have treated the use of bankruptcy powers to alter

a debtor's contracts as indicative of bad faith at the time of filing, this Court will not do so in this case. *Those issues will be adjudicated at the hearing on the Hyatt Adversary Proceeding which shall commence almost immediately following the entry of this Order.*

Although the *Carolin* court recognized that the identification of certain "indicia" of bad faith may be a useful exercise in determining the subjective bad faith component of the *Carolin* standard, *the court made very clear that the totality of the circumstances in a case should govern the analysis.* It is not appropriate to limit or focus the analysis upon any particular "indicia" or pattern otherwise associated with bad faith or to engage in counting the "indicia." *Carolin,* at 701; *accord Belair,* 1992 WL 200849, at p. 3. "[T]here is no single factor that will necessarily lead to a finding of bad faith." *Carolin,* at 701 citing *In re Natural Land Corp.,* 825 F.2d 296, 298 (11th Cir.1987).

The "indicia" of a bad faith filing usually examined by the courts include the following:

1. The debtor has one asset;

2. Secured creditors' liens encumber the asset;

3. There are generally no employees except for the principals and there is no ongoing business activity;

4. The debtor has little or no cash flow and no available sources of income to sustain a plan of reorganization or make adequate protection payments;

5. There are few, if any, unsecured creditors whose claims are relatively small;

6. There are allegations of wrongdoing by the debtor or its principals;

7. The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of secured creditors to enforce their rights;

8. The debtor is afflicted with the "new debtor syndrome" in which a one asset entity is created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors;

172

9. There is no realistic possibility of reorganization of the debtor's business;

10. The reorganization essentially involves a two-party dispute; and

11. Bankruptcy offers the only possibility of forestalling loss of the property.

See, e.g., Host Management, Inc. v. Palace Homeowner's Assoc., Inc., No. 4:91–3132–21, n. 3 (D.S.C. 7/15/92) (Traxler, J.).

■ A review of the totality of the facts presented at the Evidentiary Hearing does not establish subjective bad faith on the part of Dunes:

(a) The reported decisions of courts in the Fourth Circuit which have dismissed bankruptcy cases for bad faith have usually involved situations in which the debtor entity was purchased or formed on the eve of bankruptcy and accordingly suffered from the "new debtor syndrome." See In re AMA Corp., 175 B.R. 894 (Bankr.W.D.Va.1995); Carolin; Resolution Trust Corp. v. C & R, L.C., 165 B.R. 593 (Bankr.W.D.Va.1994). Dunes had been in existence for more than 20 years when it filed for Chapter 11 protection. Dunes has owned the Hotel Property since the early 1970s and built the hotel. Therefore, this case does not involve a "new debtor syndrome" situation.

■ (b) Dunes owns a significant business enterprise which generates substantial cash flow. Dunes' primary asset (the Hotel Property) is also a substantial operating business which currently generates more than $26 million in annual cash flow. Dunes' ownership of such a "single asset" simply does not evidence bad faith in this case. See, e.g., In re Marion Street Partnership, 108 B.R. 218, 223 (Bankr.D.Minn.1989); (mere

fact that case involves a single asset debtor does not demonstrate bad faith); In re Foundry of Barrington Partnership, 129 B.R. 550, 555–56 (Bankr.N.D.Ill.1991) (same); In re Tiffany Square Associates, Ltd., 104 B.R. 438, 441 (Bankr.M.D.Fla.1989) (same).

■ (c) Dunes also has conducted a significant ongoing business. Dunes built the hotel in the mid–1970s and substantially expanded and renovated the property in the mid–1980s and in 1992. The hotel has been in continuous operation since its original construction was completed. The Hotel Property employs hundreds of people. Although SC Hyatt is the record employer of these people, the economic reality is that these employees receive their pay and benefits exclusively as charges against the Hotel Income. In addition, the Hotel Income is used (or charged) to pay all taxes, insurance, vendor and supplier expenses, and all other operating expenses of the Hotel Property.[14]

■ (d) When Dunes filed its Chapter 11 case, Aetna was in the process of foreclosing on its non-recourse loan in the amount of approximately $47–48 million. Dunes has at least several million dollars in equity in the Hotel Property over and above the amount of the Aetna Claim. Dunes did not have the cash to pay the Aetna Claim in full. Accordingly, when Dunes sought Chapter 11 relief, it confronted a clear financial crisis with Aetna and was threatened with the loss of a valuable asset in which it had significant equity.[15]

(e) The Hotel Property was (and still is) subject to the SC Hyatt Agreement. Dunes asserts that the SC Hyatt Agreement adversely affects the cash flow, value, and refi-

14. The fact that SC Hyatt operates the Hotel Property pursuant to the SC Hyatt Agreement does not alter the fact that Dunes is the business owner. See In re Metro, Ltd., 108 B.R. 684, 686–87 (Bankr.D.Minn.1988) ("The fact that [a] limited partnership hires an outside management company to manage the building also does not alter the conclusion that it is carrying on a business.").

15. The filing of a Chapter 11 case during the pendency of foreclosure is permissible under the Bankruptcy Code since the alternative is simply to lose valuable property. See Carolin, at 703 (the Bankruptcy Code not only manifestly sanc-

tions, but affirmatively encourages the eleventh-hour invocation of its protections); Sweetbrier I Ltd. Partnership, slip op. at p. 5 (the filing of a Chapter 11 petition during the pendency of foreclosure does not constitute bad faith because "there is no requirement that a debtor must exhaust all state court remedies, in order to seek protection under Chapter 11"); In re Bellevue Place Associates, 171 B.R. 628, 634 (Bankr. N.D.Ill.1994) (eve of foreclosure filing not bad faith when purpose of filing to protect debtor from harm created by foreclosure and to provide debtor with a forum to resolve all claims).

nancing and sale prospects of the Hotel Property.

(f) Pre-petition negotiations between Dunes and Aetna regarding the Aetna debt and between Dunes and Hyatt/SC Hyatt regarding the SC Hyatt Agreement were not successful.

█ (g) Dunes also timely filed the Hyatt Adversary Proceeding after negotiations between Dunes and Hyatt/SC Hyatt failed. Dunes asserts that the resolution of the Hyatt Adversary Proceeding is an integral part of its overall reorganization efforts. Dunes' prosecution of the Hyatt Adversary Proceeding evidences its intent to reorganize and is not an indication of bad faith. *See, e.g., In re Lubrizol Enterprises, Inc. v. Richmond Metal Finishers,* 756 F.2d 1043, 1048 (4th Cir.1985), *cert. denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1985) ("Congress has plainly provided for the rejection of executory contracts, notwithstanding the obvious adverse consequences for contracting parties thereby made inevitable"); *Host Management,* slip op. at p. 10 ("This authority to reject executory contracts is absolutely fundamental to the bankruptcy law because it provides a mechanism through which extreme financial burdens may be averted while the debtor attempts to reorganize."); *In re Marina Enterprises, Inc.,* 14 B.R. 327 (Bankr.S.D.Fla.1981) (same); *In re Continental Airlines Corp.,* 38 B.R. 67, 71–72 (Bankr.S.D.Tex.1984) (same).

(h) Since the filing of the Dunes case, Dunes has: (i) paid substantial Adequate Protection Payments to Aetna (which already amount to at least $1.6 million); (ii) left SC Hyatt undisturbed as the operator of the Hotel Property pending the outcome of the Hyatt Adversary Proceeding; (iii) timely filed the Plan (with a disclosure statement hearing set for June 2, 1995); (iv) proposed an alternative non-impairment plan for Aetna and SC Hyatt if the Court decides that such treatment of their claims is necessary to confirm a plan; (v) timely filed and prosecuted the Hyatt Adversary Proceeding; and (vi)

proposed to secure the economic support of GEPT to fund Dunes' reorganization efforts. These facts evidence that Dunes is not delaying proceedings in this case and is attempting to move forward with its proposed reorganization.

(i) There have been no allegations of fraud or wrongdoing by the debtor.

█ In summary, the majority of these indicators presently weigh in favor of the Debtor, such that the evidence does not establish subjective bad faith on the part of Dunes and the Dunes case does not fall within any "pattern" of subjective bad faith. The Movants have failed to meet their burden under the second prong of the *Carolin* standard. This failure also requires denial of their Dismissal Motions.[16]

### B. Aetna Is Not Entitled To Stay Relief In This Case.

█ Aetna has asked the Court to grant stay relief under Bankruptcy Code § 362(d)(1) based on an alleged lack of adequate protection.[17] The facts and applicable law simply do not support this request. The $53 million value of the Hotel Property establishes that Aetna has a substantial equity cushion in this case (which amounts to more than $3.5 million even if all of Aetna's claimed costs and default interest are included in its claim). Aetna has been paid (and continues to be paid) its full contract rate of interest under the Promissory Note. Aetna already has received at least $1.6 million of Adequate Protection Payments. Proceedings on the Plan are moving forward expeditiously, with a hearing on the Disclosure Statement set for June 2, 1995. The size of the equity cushion in this case and the large Adequate Protection Payments being made to Aetna (as well as the expeditious conduct of the case) establish that Aetna is not entitled to stay relief. *See, e.g., In re Carson,* 34 B.R. 502, 506–07 (D.Kan.1983); *In re Pitts,* 2 B.R. 476, 478–79 (Bankr.C.D.Cal.1979).

---

16. For the same reasons, Aetna's request for stay relief on the basis of bad faith also must be denied.

17. The Court already has addressed (and has denied) Aetna's stay relief requests based on allegations of bad faith.

■ Also, there is no evidence that the value of the Hotel Property is decreasing. The fact that the value of Aetna's collateral is not declining also requires a denial of stay relief. *See, e.g., In re Continental Airlines, Inc.,* 146 B.R. 536, 539 (Bankr.D.Del.1992) ("Post–[*United Savings Association of Texas v.*] *Timbers* [*of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) ] courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral."); *In re Harvey Road Associates VIII,* 140 B.R. 302, 307 (Bankr.D.Mass.1992) (same); *In re Confederation Life Insurance Co. v. Beau Rivage Ltd.,* 126 B.R. 632, 640 (N.D.Ga.1991) (same).

■ Finally, Aetna's allegation that it is not adequately protected is based upon its assertion that accrual of default interest and costs is eroding its equity cushion. This allegation does not constitute appropriate grounds for stay relief. *See, e.g., In re Westchase I Associates, L.P.,* 126 B.R. 692, 694–95 (W.D.N.C.1991) (the North Carolina District Court ruled that a bankruptcy court committed reversible error in ordering adequate protection payments to protect the amount of an oversecured creditor's equity cushion); *In re Chauncy Street Assoc. Ltd. Partnership,* 107 B.R. 7, 8 (Bankr.D.Mass.1989); *In re Senior Care Properties, Inc.,* 137 B.R. 527, 529 (Bankr.N.D.Fla.1992).

### C. *Exclusivity Should Not Be Terminated In This Case.*

■ SC Hyatt has asked the Court to terminate Dunes' exclusive period to file and obtain acceptance of a plan of reorganization under Bankruptcy Code § 1121. However, SC Hyatt has failed to demonstrate that there is any "cause" to terminate exclusivity as required under Bankruptcy Code § 1121(d). Dunes has filed the Plan within the initial 120–day exclusive period. Dunes has proposed a non-impairment plan if such a plan is required to achieve confirmation. Proceedings on confirmation are moving forward expeditiously. SC Hyatt remains in operation of the Hotel Property pending the outcome of the Hyatt Adversary Proceeding. SC Hyatt has demonstrated that it has not formulated or prepared a plan of reorganization of its own. In light of these facts, the Court finds no cause to terminate Dunes' exclusivity at this time.

### CONCLUSION

Pursuant to all of the foregoing Findings of Fact and Conclusions of Law, the Court will deny all of the relief requested in the Aetna Motion and will deny all of the relief requested in the SC Hyatt Motion.

**AND IT IS SO ORDERED.**